**WISCONSIN REPORTS.** 185

Townsends et al. vs. The Bank of Racine.

## TOWNSENDS, BEAN and BURLOCK, Appellants,

*vs.*

## THE BANK OF RACINE, Respondent.

APPEAL FROM RACINE CIRCUIT COURT.

The refusal of a bank to redeem its bills on presentation, is *prima facie* a failure of the bank.

Payment in the bills of a bank which has failed is, in law, no payment.

Where the bill of exceptions does not purport to contain all the evidence given in the case, and the charge of the judge is based upon the evidence given on the trial, the court will presume that evidence was given to which the charge relates, though it does not appear in the bill of exceptions.

The failure to return or offer to return bills of a broken bank received in payment, after their character is ascertained; or within a reasonable time, affects the measure of damages only.

Where a draft was purchased and paid for in bills of a broken bank, by an agent of the defendant, the agent not disclosing his name or character or principal, it is sufficient if the vendor of the draft return or offer to return such bills within a reasonable time after he ascertains the purchaser.

*Semble.* That if the bills are retained an unreasonable time after their character became known, as well as the person who paid them out, whatever loss might be sustained by depreciation while the bills are so retained, must be borne by the party so retaining them.

Where the fact that the defendant was really the person who paid out the broken bank bills was ascertained on the trial. the offer to return them then and there is sufficient.

The action was commenced by filing a declaration, which contained the common money counts, and a special count, as follows :

"Edwin Townsend, John G. Townsend, Walker L. Bean, and William E. Burlock, partners in business, and doing business under the name, firm and style of Townsend, Bean & Burlock, plaintiffs in this suit by Butler and Cary, their attor-

neys, complain of the Bank of Racine, a corporation organized under the laws of the State of Wisconsin, defendants in this suit, by filing and serving a declaration in pursuance of the statute authorizing the commencement by declaration, and not by a writ of a plea of trespass on the case. For that whereas, heretofore, to wit., on the twentieth day of December, A. D. 1856, the said plaintiffs were partners in business, under the name, style and firm of Townsend, Bean & Burlock, and by that name were doing a general banking business at the city of Milwaukee, to wit., at Racine aforesaid; and as such bankers were selling exchange on the city of New York for a premium, and being such bankers, the said defendants on the said twentieth day of December, A. D. 1856, at the city of Milwaukee, to wit., at Racine aforesaid, purchased of the said plaintiffs their sight draft on Wm. J. Bell & Co., of the city of New York; payable to the order of John Wilson, for the sum of thirteen hundred and eighty-five dollars and seventy-five cents, then and there, being of the value of fourteen hundred and six dollars and fifty cents, for which the said defendants then and there agreed to pay to said plaintiffs the said sum of fourteen hundred and six dollars and fifty cents, but to pay the same or any part thereof the defendant did then and there neglect and refuse and still does neglect and refuse."

Plea, general issue.

On the trial in the circuit court, the plaintiffs called John Wilson, the book keeper of the bank, who testified that the draft then shown him, and presently to be described, was received by him from Henry Ullman, president of the bank; that he endorsed it at Ullman's request; that he never had any interest in it; did not know where Ullman got it. There was no endorsement on it when he endorsed it; knew of no arrangement about the purchase of it; Ullman agreed to see him harmless from endorsing it.

Townsends et al. vs. The Bank of Racine.

Henry J. Ullman testified, that he was president of the Bank of Racine, and was so December 20, 1856. A draft being shown him, said he had seen it before on the evening of the 20th December, 1856; it was handed him by George H. Carpenter. He sent Carpenter to purchase it. The following is a copy of the draft:

$1385,75.                                              No. 2190.

Banking House of Townsend, Bean and Burlock, Milwaukee, Wis., Dec. 20th, 1856. At sight, pay to the order of John Wilson, Thirteen Hundred and Eighty-five dollars and seventy-five cents.

To Wm. J. Bell & Co., New York.

TOWNSEND, BEAN & BURLOCK."

· (Endorsed as follows :)

"Pay to the order of J. S. Judson. JOHN WILSON."

"Pay to the order of Henry J. Ullman, Pt. J. S. JUDSON."

"Pay to the order of the American Exchange Bank, New York City.                              HENRY J. ULLMAN, Pt."

(It was admitted that the defendant furnished the money to purchase the draft.)

· The witness further testified : "Of the money furnished to Carpenter to purchase the draft, nine hundred dollars was bills of the Exchange Bank of Bangor, Maine ; we wanted the New York exchange ; in buying drafts, we generally pay out such currency as we do not wish to use ; the party from whom I received this nine hundred dollars was interested in its circulation ; exchange was then selling at one and a half per cent.; in selling exchange we make no difference between eastern and western money ; we had not received advices of the failure of the Exchange Bank before sending to buy the exchange, we had however received a telegram that the Exchange, Mercantile, and Eastern Banks would be discredited, but would be redeemed at home ; I got this dispatch about

eleven o'clock in the forenoon of the 20th of December, 1856, and on that account selected out that money and sent to Milwaukee; Carpenter said Marshall & Illsley refused to take the money before he passed it to the plaintiffs."

On his cross examination, he testified that he mailed the draft to the American Exchange Bank, December 22d, and they acknowledged its receipt December 26th.   The draft was paid.

Henry Magneburg testified as follows: "I reside in Milwaukee and am in the employ of plaintiffs, and was so December 20th, 1856; I was teller in their bank; (the draft above described was shown witness,) I sold this draft; did not know the person to whom I sold it at the time; he said he was buying it for some one else; he directed us to make it payable to John Wilson; he paid me fourteen hundred dollars for it, of which nine hundred dollars was Exchange Bank of Bangor, and five hundred in Illinois and Wisconsin currency; we sent the Bangor bills same day to New York, to convert into exchange, to Wm. J. Bell & Co., and they returned them to us; can't say how long it was before they came back; within a few moments after I took the bills, I learned they were not good; I received the money between one and three o'clock in the afternoon of the 20th of December, 1856; I learned they were bad from Marshall & Illsley; then one of the plaintiffs went out to find the man I took them of; after the bills were returned from New York we kept them; (a package of bills on the Exchange Bank of Bangor, amounting to nine hundred dollars, was here shown witness,) these are the bills I took in payment of the draft."

On his cross-examination, he testified as follows:   "Think the bills were returned from New York in January after; I did not mark them; I think our house in New York would not change the bills; we got our returns from our New York house the first week in the month; I think the draft came back the first of January; it is our custom to receive back

all drafts each month; Illsley informed me the bills were bad; one of the plaintiffs so informed me that Illsley told him."

George H. Carpenter, sworn for plaintiff, says: "I reside in Racine; (said draft is here shown witness;) can't swear that I ever saw this paper before; I once went to Milwaukee to buy exchange for the bank some ten months ago; have bought exchange for them at other times; I took fourteen hundred dollars at that time; more than half of it was Bangor money, can't say what bank; Henry J. Ullman furnished me the money, and requested me to go; I took the draft in the name of John Wilson, at the direction of H. J. Ullmann; I first went into Marshall & Illsley's, and they said they did not like the Bangor money; they said it was not being redeemed in New York, and they did not know whether it was good or not; they had received a telegram about it; I went into no other office except the one I bought the draft of; (the $900 of Bangor Bank bills above mentioned was here shown to the witness;) the money was Bangor money, but I can't tell what bank; Ullmann told me when he gave me the money, that he supposed the money would not be redeemed in New York after a few days, but it was good enough, and to save the trouble of sending it to Maine, he would prefer exchange and have it done with; he asked me to go to Milwaukee and buy some exchange; he told me if I could not get exchange for one, or one and a half or two per cent., at the outside, to bring it back."

It was admitted that the endorsement of the words "J. S. Judson," on said draft, was in the handwriting of said Judson, and that on the 20th day of December, 1856, he was, and ever since has been, a clerk in the said Bank of Racine.

The plaintiffs then read in evidence the deposition of Edwin Clark, which was in substance as follows:

"On the 20th of December, 1856, witness was cashier of the Exchange Bank of Bangor, Maine, and had been for six

years; (identifies bills of that bank which were produced;) the bank refused to redeem its bills in specie on the said 20th day of December, 1856; $7,600 of the bills of that bank were presented on that day, and payment in specie demanded, which was refused by the bank; it was between nine and ten o'clock in the morning that said bills were presented; the bank had not before that day refused to pay specie on its bills; it has not since the 20th of December, A. D. 1856, redeemed its bills in the usual way; it has not since that time kept open doors to redeem its bills, but on the 22d of said December the bank was open, and we redeemed a few bills, some $15 or $20; the bank was finally closed by an injunction served December 22d, A. D. 1856; I think there was a large amount of bills presented on said 20th, and specie was demanded, which was refused; the said $7,600 were presented by Mr. Snell, as the property of the Suffolk Bank, to me; I refused to pay the bills in specie, and claimed fifteen days as the law allowed the bank. I did not pay the specie; they were presented during banking hours, and have never since been redeemed; the amount of the indebtedness to the Suffolk Bank has been reduced; we had the funds on the way, but nothing has been paid out of the bank; the bank was insolvent, and had been for three or four months; the injunction was issued on application of the Bank Commissioners of the State; the bills of the bank have not been current in the vicinity of the bank since December 20th, 1856, except that they were taken for about a week by the banks of their customers; the affairs of the bank are in the hands of a receiver appointed by the court.

A. R. R. Butler testified that he was present at the taking of Clark's deposition; the package of bills produced here in court were shown to him on his said examination, and I put my initials on one of them at the time, and this is the bill.

Here the plaintiffs rested their case, and the defendant recalled Henry J. Ullmann, who testified that the telegram here

produced was the one received from Boston by him from his brother, December 20th, 1856; which telegram was in the words and figures following:

" Exchange Bank, Bangor, Eastern and Mercantile, will be discredited to-morrow; will be redeemed at home."

In the latter part of December and fore part of January, these bills were worth 75 cents, the latter part of January 50 cents, as quoted by Thompson and others; I would have bought them at that rate ; know of no sales; had knowledge of the value of the bills from my brother and quotations.

The evidence being closed, the plaintiff tendered to said defendant, said package of bills, on said Exchange Bank, of Bangor, Maine, when the judge charged the jury as follows:

" That the plaintiff's right to recover was based upon the claim that at the time they received the bills of the Exchange Bank, of Bangor, the said bank had failed. The failure of the bank is a fact for you to find from the evidence; if you believe, from the evidence, that the bank had a right to take fifteen days to pay specie on its bills, after presentation, then the refusal to pay on demand on the 20th of December, 1856, was not a failure, but the service of the injunction on the 22d was a failure."

The judge further charged the jury, " that it was the duty of the plaintiffs as soon as they ascertained the facts in the case, and within a reasonable time, to have offered to return the bills to the defendant, and that without such offer to return the plaintiff could not recover; and that if they found from the evidence that no offer to return said bills to the defendant had been made by the plaintiffs before bringing this action, that they must find for the defendant." To all of which the plaintiffs excepted. The jury found a verdict for the defendant, upon which judgment was rendered, from which the plaintiffs appealed.

*Cary, Farr & Evans,* and *Butler, Buttrick & Cottrell,* for appellants.

1. The refusal of the Bank on the 20th day of December, A. D., 1856, to redeem its bills in specie, or "in the usual way" was a failure of the bank, and was a matter of law pertinent to the issue, and the judge should so have instructed the jury. Payment by the respondent to the appellant in bills of a bank that had failed to redeem in specie, or in the usual way, was no payment. 2 Greenleaf's Ev., § 522, p. 513; *Ontario Bank vs. Lightbody,* 11 Wend., 9; same case affirmed, 13 Wend. 101; *Harley vs. Thornton,* 2 Hill, 503, Chitty on Bills, chap. 6, p. 247; *Fogg vs. Sawyer,* 9 New Hamp. Rep. 365; *Gilman vs. Peck,* 11 Vt. Rep., 516; *Wainwright vs. Webster,* 11 Vt. Rep., 576; *Markle vs. Hatfield,* 2 Johns, Rep., 445.

The judge erred in charging the jury that if they found from the evidence that no offer to return said bank bills to the defendant had been made before bringing their action, that they must find for the defendant.

This was equivalent to instructing the jury to find for the defendant, as there was no pretence that any such proof had been offered. The failure to return the bills could only affect the measure of damages, and not the right of action. *Ontario Bank, vs. Lightbody,* 13 Wend. 111, and onwards; *Purkford vs. Maxwell,* 6 Term Rep., 52; *Owenson vs. Morse,* 7 Term Rep., 64.

The offer to return the bills in open court, before the case was submitted to the jury, was made in time, and was sufficient. It was as soon as the plaintiff had ascertained to whom they belonged, and therefore within a reasonable time, and in time to affect the measure of damages.

2. The judge erred in charging the jury "that if they found from the evidence that the bank had a right to take fifteen days to pay specie on its bills after presentation, the refusal to

pay on demand on the 20th of December, 1856, was not a failure." There was no evidence on which to base such a proposition, and had such a provision been contained in its charter, it would relate only to the forfeiture of its franchises, on a failure and not to the character or credit of its circulation. *Ontario Bank vs. Lightbody*, 13 Wend., 104.

*Strong & Fuller*, for the respondent.

. 1. It was the duty of the plaintiffs to have offered to return the bills within a reasonable time and before suit brought as charged by the judge. Chitty on bills, 355, 6 and 7, and notes F. and T.; *Gloucester Bank vs. Salem Bank*, 17 Mass., 33.; Story on Promisory Notes, § 389, and note.

2. There is no proof of presentment to the bank for payment. All authorities agree that there must either be proof of presentment with notice, or an offer to return within a reasonable time.

3. The notice in this case is defective, and the Supreme Court cannot change the judgment in any respect except as specified in the notice—Code, § 236,

*By the Court*, WHITON, C. J. We think there can be no doubt that the refusal of the bank to redeem its bills on the 20th of December, 1856, was, *prima facie*, a failure of the bank. We are also of opinion that the payment made for the draft, if made in the bills of a bank which had failed, was no payment. The authorities which were cited by the appellants at the argument, seem fully to sustain this position : 2 Greenlf. Ev., § 522 ; *Ontario Bank vs. Lightbody*, 13 Wend. 104 ; *Fogg vs. Sawyer*, 9 N. H. R., 365 ; *Gilman vs. Peck*, 11 Vt. R., 516. It follows, as we think, that upon proving these

facts to the satisfaction of the jury, the plaintiff would have made out his case *prima facie.*

It appears by the bill of exceptions that the judge instructed the jury that if they believed from the evidence " that the bank had a right to take fifteen days to pay specie on its bills after presentation, then the refusal to pay on demand, on the 20th of December, 1856, was not a failure."

There is nothing in the bill of exceptions which enables us to see the pertinency of this instruction, because the testimony as contained in the bill of exceptions does not tend to establish that fact. The witness Clark, testifies that when the bills were presented to the bank, on the 20th of December, " I refused to pay the bills in specie, and claimed fifteen days as the law allowed the bank." We do not suppose it will be contended, that this testimony was sufficient to establish the fact, that the law of the state in which the bank was situated, authorized the bank to refuse to pay its bills for fifteen days after they were presented for payment. As the bill of exceptions does not purport to give all the testimony, we suppose there was testimony upon this subject which is not contained in the bill of exceptions, and to which the instructions of the judge related.

In the absence of this testimony we cannot say as the judge committed an error in giving this instruction to the jury. It appears that the judge further instructed the jury " that it was the duty of the plaintiffs as soon as they ascertained the facts in the case, and within a reasonable time, to have offered to return the bills to the defendant, and that without such offer to return, the plaintiff could not recover.

We think this instruction of the judge was erroneous. The failure to return, or offer to return the bills before bringing the suit, would probably, under any circumstances, only affect the measure of damages. *Ontario Bank vs. Lightbody,* 13 Wend., 104. But whether this is so or not, we think the judge should have explained to the jury what he meant by

the words " within reasonable time." It does not appear when the plaintiffs first became acquainted with the fact, that the purchase of the draft was made for the bank.

The course pursued by the bank in making the purchase appears to have been somewhat singular.

Carpenter was employed to buy the draft in the name of John Wilson, by the direction of Ulman, who was president of the bank.

Magneburgh, the clerk of the plaintiffs, who sold the draft to Carpenter, testified that he did not know the person to whom he sold the draft at the time the sale was made. That upon learning that the bills in question were bad, he sent out to find the person from whom he took them.

It appears pretty conclusively from the testimony, that the interest of the bank in the purchase of the draft was concealed from the plaintiffs. Whether intentionally or not is not disclosed.

Under these circumstances we think the judge should have told the jury, that if the bills were returned or offered to be returned within a reasonable time after the fact was ascertained by the plaintiffs, that the bank was the purchaser of the draft, the case of the plaintiffs was, in this respect, fully made out, so as to entitle them to a recovery of the full amount of the bills in question.

If the agents of the bank paid out the bills innocently, and they were retained by the plaintiffs an unreasonable time after their character became known to them, and after they became aware that the bills were in fact paid out by the bank, it seems clear from the authorities that whatever loss was caused by the depreciation of the bills in value while they were thus retained by the plaintiffs should be borne by them; and perhaps this should be the rule, although the agents of the bank intended to commit a fraud, by paying out the bills : but upon this subject we give no opinion.